1  ELLISON FOLK (State Bar No. 149232)
   RYAN K. GALLAGHER (State Bar No. 344349)
2  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
3  San Francisco, California 94102
   Telephone: (415) 552-7272
4  Facsimile: (415) 552-5816
   folk@smwlaw.com
5  rgallagher@smwlaw.com

6  Attorneys for Plaintiff COMMUNITY
   ENVIRONMENTAL ADVOCATES FOUNDATION
7

8              **UNITED STATES DISTRICT COURT**

9      **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

10  COMMUNITY ENVIRONMENTAL          | Case No.:
    ADVOCATES FOUNDATION,            |
11                                   | **COMPLAINT FOR DECLARATORY AND**
            Plaintiff,               | **INJUNCTIVE RELIEF AND CIVIL**
12                                   | **PENALTIES**
            v.                       |
13                                   | **[Violations of the Clean Water Act]**
    RISE GRASS VALLEY, INC. and RISE |
14  GOLD CORP.,                      |

15          Defendants.

16  _____

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, Community Environmental Advocates Foundation, by and through its undersigned attorneys, brings this civil action for declaratory and injunctive relief and civil penalties, and alleges as follows:

**INTRODUCTION**

1.      Federal law prohibits the discharge of pollutants into waters of the United States without a valid permit. Defendants Rise Grass Valley, Inc. and Rise Gold Corp. (collectively, "Rise" or "Defendants") own the defunct and long-abandoned Idaho-Maryland Mine in the Sierra Nevada foothills. For years, Defendants have knowingly allowed numerous harmful pollutants from the Mine's flooded underground workings to discharge from surface drains directly to Wolf Creek, an important tributary in the Feather River watershed. This discharge has occurred without any permit under the Clean Water Act. Plaintiff Community Environmental Advocates Foundation brings this lawsuit to put an end to Defendants' ongoing illegal conduct.

2.      The historical Idaho-Maryland Mine was one of the most productive gold mines in the United States. From its opening in the 1860s, the Mine yielded over 2.4 million ounces of gold, collected from over 70 miles of underground tunnels and shafts. When the Mine permanently halted operations in the mid-1950s, those miles of subsurface workings were allowed to flood. Over the next seven decades, a steady stream of Mine water mixed with arsenic, iron, manganese, ammonia, and other chemicals has flowed from the flooded underground workings to surface drains, and then on to waterbodies like Wolf Creek.

3.      Wolf Creek is a perennial stream that flows through Grass Valley, California. The Creek and its surrounding watershed provides habitats for a range of plant and animal species, including species listed on the federal and state Endangered Species Acts. Wolf Creek also hosts a range of recreational uses, such as hiking, swimming, and fishing. The heavy metals and other chemical pollutants that are discharged directly into Wolf Creek from the Idaho-Maryland Mine impair the aquatic ecosystems of the Wolf Creek watershed, are harmful to its animal and plant species, pose risks to human health, and impair the use of the stream's water for irrigation.

4.      In 2017, Rise Grass Valley, Inc. purchased the Idaho-Maryland Mine site with ambitions of restarting large-scale gold mining operations there. Rise commissioned an expert

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

hydrology and water quality report in connection with its proposal to reopen the Mine. That 2021 report explained that polluted water from the Mine's flooded underground workings was flowing from several surface drains directly into Wolf Creek. It further concluded that these ongoing discharges have an adverse impact on the water quality of Wolf Creek itself. An earlier study commissioned by the U.S. Environmental Protection Agency reached similar conclusions. Despite knowing of this ongoing pollution and its impacts to Wolf Creek, Rise has not attained a valid permit to cover the discharges—and has not taken any other steps to put an end to the pollution—in the more than seven years that it has owned the Idaho-Maryland Mine site.

5.      The discharge of heavy metals and other pollutants into Wolf Creek causes harm to Plaintiff and its members and officers. Plaintiff's members and officers live near, recreate in, and use the waters of Wolf Creek and downstream waterbodies.

6.      Defendants' conduct is ongoing. Pollutants have flown constantly from the Mine drains to Wolf Creek since Defendants have owned the property. Absent declaratory and injunctive relief, this unpermitted pollution will continue to occur, Plaintiff and its members and officers will continue to be harmed, and the Wolf Creek watershed will continue to be degraded.

7.      Defendants' conduct violates federal law, and this Court can and should enjoin the unpermitted discharge of polluted Mine water into Wolf Creek.

8.      Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' longstanding, knowing, and ongoing violations.

## JURISDICTION AND VENUE

9.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "Act"). *See* 33 U.S.C. § 1365(a). This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. section 1365(a)(1) and 28 U.S.C. sections 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

10.      On September 5, 2024, Plaintiff sent a 60-day notice letter ("Notice Letter") to

3

Defendants. The Notice Letter informed Defendants of their violations under the Clean Water Act in connection with the discharges to Wolf Creek from the Mine and of Plaintiff's intention to file suit. A copy of the Notice Letter is attached as Exhibit A and is incorporated herein by reference.

11.     The Notice Letter was sent by certified mail to the registered agents for Rise Grass Valley, Inc. and Rise Gold Corp. and to the Grass Valley, California, offices of Joseph Mullin, President of Rise Grass Valley, Inc. and President and Chief Executive Officer of Rise Gold Corp.

12.     In addition, a copy of the Notice Letter was sent by mail to the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA for Region 9, the State Water Resources Control Board, and the Central Valley Regional Water Quality Control Board (collectively, "Federal and State Agencies"), as required by the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

13.     More than sixty (60) days have passed since the Notice Letter was served on Defendants and the Federal and State Agencies.

14.     Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. No claim in this action is barred by any prior administrative action under section 309(g) of the Act, 33 U.S.C. § 1319(g).

15.     Venue is proper in the Eastern District of California pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

16.     Pursuant to Eastern District of California Local Rule 120(d), intradistrict venue is proper in Sacramento, California, because the events or omissions that give rise to Plaintiff's claims occurred in Nevada County, California.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

# PARTIES

### A.    Plaintiff Community Environmental Advocates Foundation

17.    Plaintiff Community Environmental Advocates ("CEA") Foundation is a non-profit 501(c)(3) organization based in Nevada County, California, with a mailing address of P.O. Box 972, Cedar Ridge, California, 95924. CEA Foundation's mission is to carry out research, education, and advocacy to promote public policy and actions resulting in responsible land use and environmental protection in Nevada County and the Sierra Nevada region, with the overall goal of preserving the area's natural, rural, and cultural resources. CEA Foundation and its members and officers have participated in the administrative process for several development projects in Nevada County, including Rise's proposed reopening of the Idaho-Maryland Mine and other proposed commercial and residential projects. CEA Foundation has also joined with other community organizations to conduct public outreach campaigns regarding the use of herbicides to manage vegetation growth in water distribution canals in Nevada County.

18.    Members and officers of CEA Foundation live in Grass Valley, California, as well as in many of the surrounding communities. These members and officers live, work, and travel near Wolf Creek and downstream waterbodies, into which Defendants discharge pollutants. CEA Foundation's members and officers use and enjoy Wolf Creek and downstream waterbodies for various recreational and educational purposes. CEA Foundation's members' and officers' use and enjoyment of these waters is negatively affected by the pollutants that the Mine drains discharge to Wolf Creek.

19.    Specifically, members and officers affiliated with CEA Foundation wade, swim, and fish in Wolf Creek and generally use Wolf Creek for aesthetic enjoyment. Others recreate along Wolf Creek Trail, a public recreational trail that runs alongside portions of Wolf Creek. These individuals affiliated with CEA Foundation that currently recreate in Wolf Creek are worried about the ongoing pollution of the Creek linked to discharge from the Idaho-Maryland Mine and would use the Creek more or in additional ways were it not for this ongoing pollution. For example, at least one individual would fish in Wolf Creek were it not for the discharge of polluted drainage from the Mine.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

20. The interests of Plaintiff and its members and officers have been, are being, and will continue to be adversely affected by the Mine's historic and ongoing discharges of pollutants into Wolf Creek and Defendants' failure to comply with the Clean Water Act. The relief sought herein will redress the harms to Plaintiff caused by Defendants' violations.

21. Plaintiff has one or more members or officers who use, explore, and recreate in areas impacted by the pollution herein at issue and could sue in their own right.

22. Plaintiff brings this action on behalf of itself and its members and officers. None of the claims brought by Plaintiff nor the relief Plaintiff requests requires the participation of those individual members and officers.

23. Plaintiff's injuries-in-fact are fairly traceable to Defendants' conduct and would be redressed by the requested relief.

24. CEA Foundation's work includes collecting information on and investigating reports of environmental harms in the Nevada County region, participating in the administrative processes for projects or activities that cause or threaten to cause such harm, and filing or participating in litigation to address these environmental issues.

25. Defendants' ongoing pollution from the Mine drains has frustrated this mission by requiring CEA Foundation to divert its limited resources and time to researching this pollution and consulting with experts and regulatory agencies regarding it. At the time CEA Foundation undertook its initial investigation into the ongoing pollution from the Mine drains, the resources spent were not related to any litigation. CEA Foundation would have used—and would continue to use—its limited resources addressing other matters were it not for Defendants' challenged conduct.

26. Continuing commission of the acts and omissions alleged herein will cause irreparable harm to Plaintiff and its members and officers, for which there is no adequate remedy at law.

**B. Defendants Rise Gold Corp. and Rise Grass Valley, Inc.**

27. Defendant Rise Gold Corp. is a Nevada corporation with principal executive offices in Vancouver, British Columbia, Canada. Joseph Mullin is President and Chief

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

1  Executive Officer of Rise Gold Corp.

2      28.    Defendant Rise Grass Valley, Inc. is a Nevada corporation headquartered in Grass

3  Valley, California. Rise Grass Valley, Inc. is registered to do business in California. Its main

4  office is located at 345 Crown Point Circle, Suite 600, Grass Valley, California, 95945. Joseph

5  Mullin is the President of Rise Grass Valley, Inc. Rise Grass Valley, Inc. is a wholly owned

6  operating subsidiary of Rise Gold Corp.

7      29.    Defendant Rise Grass Valley, Inc. purchased most of the Idaho-Maryland Mine

8  property ("Mine property") in January 2017. At the time of Rise's purchase, the Mine property

9  included an approximately 2,585-acre subsurface estate in unincorporated Nevada County. The

10  Mine property also included two surface parcels that overlie the subsurface estate and totaled

11  approximately 175 acres—the 56-acre "Centennial Industrial Site" (acquired in January 2017),

12  and the 119-acre "Brunswick Industrial Site" (consisting of a 37-acre parcel acquired in January

13  2017 and an 82-acre parcel acquired in May 2018). In November 2024, Rise sold a 66-acre

14  portion of the Brunswick Industrial Site. Rise retains ownership of the remaining approximately

15  109 acres of surface property and the entire 2,585-acre subsurface estate.

16      30.    Defendants' subsurface estate includes approximately 73 miles of underground

17  tunnels, several raises, 4 inclined shafts, and 2 vertical shafts that remain from the historical

18  subsurface gold mining operations on the Mine property. Currently, the underground workings

19  within Defendants' subsurface estate are flooded with water.

20      31.    The Centennial Industrial Site borders Idaho Maryland Road and Centennial

21  Drive, immediately south and east of the city limits of Grass Valley, California. Wolf Creek

22  flows from east to west across the northern portion of the Centennial Industrial Site. Three

23  surface drains near the intersection of Idaho Maryland Road and Centennial Drive in the

24  immediate vicinity of the Centennial Industrial Site discharge water from the flooded

25  underground workings in Defendants' subsurface estate directly to Wolf Creek. These drains are

26  known as "Eureka Drain" (or "ED-1"), "East Eureka Shaft Drain" (or "IMD-1"), and "East

27  Eureka Shaft" (or "IMD-2").

28      32.    After acquiring the Mine property, Defendants announced plans to reinitiate large-

7

1  scale subsurface gold mining at the site. Defendants sought discretionary approvals for the

2  mining project from Nevada County, which then carried out an environmental analysis of the

3  project pursuant to the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code

4  §§ 21000 *et seq.* The Nevada County Board of Supervisors ultimately denied the discretionary

5  approvals and declined to approve the environmental analysis prepared for the project.

6      33.     Defendants also petitioned Nevada County to recognize that Defendants hold a

7  vested right to carry out mining operations on the Mine property. The County's Board of

8  Supervisors denied the Petition. Defendants have filed a petition for a peremptory writ of

9  mandate challenging the County's denial of their vested rights petition and the discretionary

10  approvals. That challenge is currently pending before the Superior Court of the State of

11  California for the County of Nevada.

12      34.     When, in this Complaint, reference is made to any act or omission of a Defendant,

13  such allegations shall be deemed to mean that the officers, directors, agents, employees, or

14  representatives of said Defendant did, or authorized such acts, or failed to adequately or properly

15  supervise, control, or direct their employees and agents while engaged in the management,

16  direction, operation, or control of the affairs of said business organization, and did so while

17  acting in the scope of their employment or agency.

18                                     **LEGAL BACKGROUND**

19      **A.     Basic Principles of Clean Water Act Liability**

20      35.     The Clean Water Act is the primary federal statute protecting surface waters in the

21  United States. The Act aims to prevent, reduce, and eliminate pollution in order to "restore and

22  maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

23  § 1251(a).

24      36.     To accomplish that goal, section 301(a), 33 U.S.C. § 1311(a), prohibits the

25  discharge of any pollutant into waters of the United States unless the discharger complies with

26  other enumerated sections of the Act, including the prohibition on discharges not authorized by,

27  or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES")

28  permit issued pursuant to section 402, 33 U.S.C. § 1342(b).

8

37.     The Act requires that all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a).

38.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from a "point source." 40 C.F.R. § 122.2.

39.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar direct and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2. Heavy metals and other chemicals associated with mine drainage—such as iron, manganese, zinc, arsenic, and ammonia—are "pollutants" under the Act. *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1138, 1141 (10th Cir. 2005); *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 306 (9th Cir 1993).

40.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2. Shafts, tunnels, and other means of "discernible conveyance" associated with mining operations are "point sources" under the Act. *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984); *El Paso Gold Mines*, 421 F.3d at 1140 n.4, 1146 n.6.

41.     The term "Waters of the United States" includes, among other things, "relatively permanent, standing, or continuously flowing" "[t]ributaries of" all waters that are "[c]urrently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce." 40 C.F.R. § 120.2; *see also* 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

42.     Each discharge of a pollutant to waters of the United States without a valid permit is a violation of the Clean Water Act.

43.     The Clean Water Act is a strict liability statute. An entity is responsible for any unpermitted discharge of pollutants to waters of the United States from a point source that arises from or occurs on the entity's property, regardless of whether the entity took some affirmative

9

act to cause the discharge. *El Paso Gold Mines*, 421 F.3d at 1145; *Comm. to Save Mokelumne River*, 13 F.3d at 308-09.

44.     Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator of a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1), 1365(f).

45.     A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. 33 U.S.C. § 1362(5). Defendants Rise Gold Corp. and Rise Grass Valley, Inc. are persons under the Act.

46.     "Effluent standard or limitation" is defined to include, among other things, the prohibition in section 301(a) against unpermitted discharges. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).").

47.     Pursuant to section 309(d) of the Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate statutory violation subjects the violator to penalties of up to $66,712 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.

48.     Section 505(a) of the Act authorizes third-party enforcement actions for injunctive relief. 33 U.S.C. § 1365(a). Section 505(d) allows a prevailing or substantially prevailing party in an enforcement action to recover litigation costs, including fees for attorneys, experts, and consultants, where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d).

**B.     State and Regional Regulation under the Clean Water Act**

49.     In California, the State Water Resources Control Board ("State Board") is charged with regulating pollutants to protect California's water resources. There are also nine Regional Water Boards within California that exercise rulemaking and regulatory authority within their respective jurisdictions. Nevada County and the Mine property are located within the

10

1  jurisdictional boundaries of the Central Valley Regional Water Quality Control Board ("Central

2  Valley Regional Board").

3        50.      Generally, in California, authorization for discharging pollutants associated with

4  industrial operations is attained either by applying for and receiving a site-specific NPDES

5  permit from the local Regional Water Board or by seeking coverage under and complying with a

6  general permit adopted by a Regional Water Board or the State Board. *See* 33 U.S.C.

7  §§ 1311(a), 1342(b); 40 C.F.R. §§ 122.28, 123.25.

8        51.      Compliance with a general permit generally constitutes compliance with the Act

9  for the purposes of those types of discharge set forth in the general permit. 33 U.S.C. § 1342(k).

10 Conversely, any noncompliance with the terms and conditions of a general permit constitutes a

11 violation of the Clean Water Act.

12       52.      If an entity discharges pollutants that fall under a general permit but does not seek

13 or obtain coverage under that general permit, the entity generally must seek and obtain a site-

14 specific NPDES permit to comply with the Act. 33 U.S.C. § 1311(a).

15       53.      Section 303 of the Clean Water Act, 33 U.S.C. § 1313, requires states to adopt

16 Water Quality Standards, including water quality objectives and beneficial uses for navigable

17 waters of the United States. The Act prohibits discharges from causing or contributing to a

18 violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R.

19 §§ 122.4(a), 122.4(d), 122.44(d)(1).

20       54.      In California, each Regional Water Board maintains a separate Water Quality

21 Control Plan, which sets forth Water Quality Standards for the waterbodies within its geographic

22 boundaries.

23       55.      The Central Valley Regional Board has adopted a Water Quality Control Plan

24 ("Basin Plan") for the Sacramento River Basin and San Joaquin River Basin, which sets forth,

25 among other things, the Water Quality Standards and beneficial uses for the Sacramento River

26 and its tributaries, including the Feather River and Bear River. With limited exceptions not

27 relevant here, under the Basin Plan, the beneficial uses assigned to any specific waterbody apply

28 to its tributary streams.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

56.     The Basin Plan does not designate beneficial uses for Wolf Creek. The Basin Plan designates the following existing beneficial uses for the Bear River: (1) municipal and domestic supply (MUN); (2) irrigation and stock watering (AGR); (3) power (POW); (4) contact recreation and canoeing and rafting (REC-1); (5) other noncontact recreation (REC-2); (6) warm freshwater habitat (WARM); (7) cold freshwater habitat (COLD); and (8) wildlife management (WILD). The Basin Plan also identifies the following potential beneficial uses for the Bear River: (1) warm and cold migration (MIGR); and (2) warm and cold spawning (SPWN). *See* Basin Plan at Table 2-1. Because Wolf Creek is an immediate tributary of the Bear River, these beneficial use designations apply to Wolf Creek under the Basin Plan.

**C.      Contaminant Levels under the Safe Drinking Water Act and State Law**

57.     Under the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, the U.S. EPA has adopted regulations that set Maximum Contaminant Levels ("MCLs") for certain types of pollutants. 42 U.S.C. §§ 300f(1)(C)(i), 300g-1(a). MCLs are the maximum permissible levels of contaminants that may be contained in water delivered to any user of a public water system. 42 U.S.C. § 300f(3).

58.     For arsenic, the U.S. EPA has adopted an MCL of 0.10 micrograms per liter. 40 C.F.R. § 141.62(b).

59.     The U.S. EPA has also adopted regulations setting Secondary Maximum Contaminant Levels ("Secondary MCLs") for other types of pollutants, including iron and manganese. 42 U.S.C. § 300g-1(c); 40 C.F.R. § 143.1. Secondary MCLs are not federally enforceable but serve primarily as guidelines for supplemental state regulation.

60.     For iron, the U.S. EPA has adopted a Secondary MCL of 300 micrograms per liter. 40 C.F.R. § 143.3. For manganese, the U.S. EPA has adopted a Secondary MCL of 50 micrograms per liter. 40 C.F.R. § 143.3.

61.     The State Board has adopted regulations that adopt the U.S. EPA's Secondary MCLs for iron and manganese as enforceable standards for certain drinking water supply systems. Cal. Code Regs. tit. 22, § 64449(a).

62.     Some general permits issued by the Central Valley Regional Board have

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

1  incorporated the U.S. EPA's MCLs and Secondary MCLs as "screening levels" for certain
2  pollutants. The exceedance of these screening levels requires an applicant for the general permit
3  to treat its discharge in order to obtain coverage under the permit. *See, e.g.*, Central Valley
4  Regional Board, "Limited Threat Discharges to Surface Waters" (NPDES CAG995002; Order
5  R5-2022-0006-02) at Attachment D (D-31).

6  **FACTUAL ALLEGATIONS**

7  **A.      Historical Operations of the Idaho-Maryland Mine**

8      63.      Mining operations at the historical Idaho-Maryland Mine began in the mid-1860s.
9  Between the mid-1860s and the mid-1950s, extractive operations at the Mine property resulted
10  in the development of approximately 73 miles of underground tunnels, 4 inclined shafts, and 2
11  vertical shafts. During this period, the Mine's operators used chemicals like mercury and
12  cyanide to recover gold from mine ore. The Mine property ultimately produced over 2.4 million
13  ounces of gold by 1956.

14      64.      In 1956, the Idaho-Maryland Mine permanently ceased all operations. The surface
15  equipment that had been located on the current Brunswick Industrial Site was removed and sold
16  off between 1956 and 1957. After the Mine closed, its extensive underground workings were
17  allowed to flood naturally with water.

18      65.      Between the end of subsurface mining operations in 1956 and 2017, ownership of
19  the Mine property passed between several entities. A sawmill and lumberyard operated on the
20  Brunswick Industrial Site from approximately 1958 to 1994. A rock crushing operation existed
21  on the Centennial Industrial Site in 1980 and again from approximately 1985 to 2004.

22      66.      Soil sampling of the Centennial Industrial Site conducted in 1989, 1990, and 1993
23  for potential property sales showed elevated concentrations of arsenic, chromium, lead, and
24  mercury associated with the mine tailings on the Centennial Industrial Site.

25      67.      The underground workings within the Mine property's subsurface estate remained
26  flooded during this period of post-mining operations on the two surface parcels. Although some
27  prior owners of the Mine property proposed to reinitiate subsurface gold mining operations and
28  to dewater the Mine's flooded underground workings, these proposals were never carried out.

13

1  There are now approximately 1,183 acre-feet of water within the underground workings in the

2  Mine property.

3        **B.    Ongoing Discharge of Pollutants from Surface Drains to Wolf Creek**

4        68.    Since at least 1994, and potentially starting much earlier, three surface drains near

5  the intersection of Idaho Maryland Road and Centennial Drive in the immediate vicinity of the

6  Centennial Industrial Site have discharged water from the Mine property's flooded underground

7  workings directly into Wolf Creek. These drains are known as the "Eureka Drain" (or "ED-1"),

8  "East Eureka Shaft Drain" (or "IMD-1"), and "East Eureka Shaft" (or "IMD-2").

9        69.    The Eureka Drain (ED-1) is located near the northwest corner of the intersection

10  of Idaho Maryland Road and Spring Hill Road. Flow from the Eureka Drain enters into a culvert

11  that crosses beneath Idaho Maryland Road and discharges directly to Wolf Creek. Flows of

12  water at the Eureka Drain have been measured at approximately 100 gallons per minute ("gpm")

13  in 1994, "a few" gallons per minute in 2018, and 25 gpm in 2019.

14        70.    The East Eureka Shaft Drain (IMD-1) is located near the southeast corner of the

15  intersection of Idaho Maryland Road and Centennial Drive. A 24-inch galvanized steel culvert

16  conveys water directly from the drain to Wolf Creek. At the East Eureka Shaft Drain, flows

17  were measured at approximately 60 gpm in 2007 and 2018 and 100 gpm in 2019.

18        71.    The East Eureka Shaft (IMD-2) consists of a small steel pipe near the East Eureka

19  Shaft Drain, which discharges to Wolf Creek. At the East Eureka Shaft, flows were measured at

20  approximately 1 to 2 gpm in 2018.

21        72.    Wolf Creek is a perennial tributary of the Bear River, which itself is a tributary of

22  the Feather River. Both the Bear River and the Feather River are navigable. The flows of Wolf

23  Creek are generally 10 cubic feet per second or less.

24        73.    Wolf Creek downstream and in the immediate vicinity of the surface drains is

25  actively used as a water supply for irrigation, stock watering, power, and recreational activities,

26  including hiking, wading, swimming, and fishing. There are significant wetland habitats in and

27  around Wolf Creek downstream of the surface drains, including a contiguous length of

28  approximately 1,600 feet of wetlands extending from the surface drains to the western boundary

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

1   of the Centennial Industrial Site.

2   74.   Wolf Creek, the adjoining wetlands, and other habitats in its watershed around and

3   downstream of the surface drains supply habitat for a range of plant and animal species,

4   including species listed under the federal and state Endangered Species Acts.

5   **C.   Discharges of Pollutants to Wolf Creek under Rise's Ownership**

6   75.   In January 2017, Defendant Rise Grass Valley, Inc. purchased the Mine property.

7   Defendants proposed to restart large-scale, long-term subsurface gold mining operations on the

8   Mine property.

9   76.   In connection with its proposal to restart gold mining at the Mine property, and as

10  part of the environmental review process for the proposed project under CEQA, Rise

11  commissioned EMKO Environmental, Inc. to prepare a groundwater hydrology and water

12  quality analysis report. The final report ("EMKO Report") was published in February 2021. The

13  EMKO Report was included as Appendix K.2 to the Draft Environmental Impact Report that

14  Nevada County prepared for the proposed Mine reopening project pursuant to CEQA.

15  77.   The EMKO Report relied upon water samples of Wolf Creek and the three surface

16  drains that were collected in 2018.

17  78.   The EMKO Report generally compared the concentrations of various pollutants

18  measured in the drains to the U.S. EPA's MCLs or Secondary MCLs for those pollutants.

19  79.   The water sampling recorded iron concentrations in the three surface drains

20  ranging between approximately 1,600 and 4,800 micrograms per liter. These concentrations

21  significantly exceed the relevant U.S. EPA limits for iron of 300 micrograms per liter.

22  80.   The water sampling recorded manganese concentrations in the three surface drains

23  ranging between approximately 200 and 300 micrograms per liter. These concentrations

24  significantly exceed the relevant U.S. EPA limits for manganese of 50 micrograms per liter.

25  81.   The water sampling recorded arsenic concentrations in the three surface drains

26  ranging between approximately 37 and 41 micrograms per liter. These concentrations

27  significantly exceed the relevant U.S. EPA limits for arsenic of 10 micrograms per liter.

28  82.   The water sampling also recorded elevated levels of ammonia in all three surface

15

1 drains of approximately 50 to 240 micrograms per liter, elevated concentrations of total
2 suspended solids in the Eureka Drain (ED-1) and East Eureka Shaft (IMD-2), and elevated
3 concentrations of zinc in the Eureka Drain (ED-1).

4      83.    Referencing earlier water quality samples collected in 1991 and 2006, the EMKO
5 Report concluded that the concentrations of pollutants within the surface drain water did not
6 appear to have changed significantly in the three decades prior to the 2018 sampling.

7      84.    The EMKO Report also concluded that concentrations of various pollutants that
8 occur in the surface drain water are significantly higher in water samples collected downstream
9 of the surface drain outflows than in samples collected upstream. For example, iron
10 concentrations were measured at 310 micrograms per liter immediately downstream of the
11 drains compared to 240 micrograms per liter upstream; manganese concentrations were 35
12 micrograms per liter downstream compared to 15 micrograms per liter upstream; and arsenic
13 concentrations were 4.0 micrograms per liter downstream compared to 1.3 micrograms per liter
14 upstream.

15      85.    The EMKO Report specifically attributed the increased concentrations of iron and
16 manganese within Wolf Creek downstream of the surface drains to the ongoing discharges from
17 the drains.

18      86.    In 2019, the U.S. EPA commissioned Weston Solutions, Inc. to conduct a Site
19 Inspection of the Centennial Industrial Site, pursuant to the Comprehensive Environmental
20 Response, Compensation, and Liability Act. The final report ("Weston Report") was published
21 in September 2019.

22      87.    To prepare the Weston Report, Weston collected water samples from the "East
23 Eureka Outflow" in April 2019. The East Eureka Outflow sampling location was located near
24 where the East Eureka Shaft Drain discharges to Wolf Creek. Water samples were also collected
25 from Wolf Creek at three locations upstream of the East Eureka Outflow discharge point.

26      88.    Based on the April 2019 water sampling, the Weston Report concluded that water
27 from the Mine property's underground workings discharged via the East Eureka Shaft Drain
28 contained arsenic and lead "at concentrations significantly above background" levels. The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

1    highest arsenic concentrations within Wolf Creek were collected at the sampling location nearest

2    downstream of the East Eureka Outflow. The water sampling also indicated elevated

3    concentrations of chromium, cobalt, copper, lead, nickel, and zinc within the East Eureka

4    Outflow itself. The Weston Report attributed the elevated arsenic and lead levels in Wolf Creek

5    in part to the discharge from the East Eureka Outflow.

6    89.    The Weston Report also concluded that arsenic, lead, and mercury were present in

7    concentrations "significantly above background" levels in wetland sediments downstream of the

8    Mine property's surface drains. Surface waters within wetlands downstream of the drains

9    exhibited arsenic and lead concentrations "significantly above background" levels.

10    90.    On information and belief, the flow of water and the concentrations of pollutants

11    discharged from the three surface drains has not changed significantly since the 2018 and 2019

12    sampling events.

13    91.    The discharge of pollutants like iron, manganese, arsenic, and ammonia to Wolf

14    Creek from the three surface drains has a significant adverse effect on the wetlands and other

15    habitats in and around the Wolf Creek watershed and the plant and animal species that occur in

16    those habitats. The discharges also adversely impact the quality and availability of recreational

17    activities carried out within and near Wolf Creek, like hiking, swimming, wading, and fishing.

18    92.    On information and belief, Defendants have not formally applied for or obtained

19    coverage under any general or site-specific NPDES permit in connection with their ongoing

20    discharge of pollutants from the Mine property's surface drains.

21                                **<u>CLAIMS FOR RELIEF</u>**

22                              **FIRST CAUSE OF ACTION**

23    **Discharges of Pollutants to Waters of the United States without NPDES Permit Coverage**

24          **in Violation of the Clean Water Act (33 U.S.C. §§ 1311(a), 1365(a), 1365(f))**

25    93.    Plaintiff hereby incorporates the allegations in the above paragraphs as though

26    fully set forth herein.

27    94.    Defendants discharged and continue to discharge pollutants from the flooded

28    underground workings of their Mine property into waters of the United States without NPDES

                                         17

permit coverage, in violation of the Clean Water Act section 301(a), 33 U.S.C. § 1311(a). The discharges of water from the Mine property into Wolf Creek from the surface drains near the Centennial Industrial Site constitute discharges of pollutants from a point source into waters of the United States without a permit.

95.     Defendants' violations of Clean Water Act section 301(a), 33 U.S.C. § 1311(a), are ongoing.

96.     Defendants will continue to be in violation of the Clean Water Act each and every time pollutants are discharged directly into waters of the United States in violation of section 301(a) of the Act. Each discharge from each surface drain is a separate and distinct violation of the Act.

97.     By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring after September 2019 of up to $66,712 per day.

98.     An action for injunctive relief under the Clean Water Act is authorized under 33 U.S.C § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which Plaintiff has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court grant the following relief:

1.     Judgment for Plaintiff in this matter enjoining Defendants' illegal conduct.

2.     A Court order declaring Defendants to have violated and to be in violation of the Clean Water Act for their unpermitted discharge of pollutants into Wolf Creek.

3.     A Court order enjoining Defendants from violating the substantive and procedural requirements of sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

4.     A Court order assessing civil monetary penalties for each violation of the Clean Water Act in the amount of $66,712 per day per violation.

5.     A Court order awarding Plaintiff its reasonable costs of suit, including attorney,

witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and any other applicable laws.

6.     And any other relief as this Court may deem just and appropriate.

DATED: December 20, 2024          SHUTE, MIHALY & WEINBERGER LLP

By: _____
ELLISON FOLK
RYAN K. GALLAGHER
Attorneys for COMMUNITY
ENVIRONMENTAL ADVOCATES
FOUNDATION

1856793.8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES
Case No.

**EXHIBIT A**



**SHUTE, MIHALY**
**& WEINBERGER** LLP

396 HAYES STREET, SAN FRANCISCO, CA 94102          RYAN K. GALLAGHER
T: (415) 552-7272   F: (415) 552-5816                      Attorney
www.smwlaw.com                                             rgallagher@smwlaw.com

September 5, 2024

***Via Certified Mail / Return Receipt Requested***

Joseph Mullin
President, Rise Grass Valley, Inc.
President and CEO, Rise Gold Corp.
345 Crown Point Circle, Suite 600
Grass Valley, CA 95945

Paracorp Incorporated
(Registered Agent for Rise Grass Valley, Inc.)
2804 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Nevada Business Center, LLC
(Registered Agent for Rise Gold Corp.)
701 South Carson Street, Suite 200
Carson City, NV 89701

Re:   **Notice of Ongoing Violations and Intent to File a Citizen Suit under the
      Clean Water Act**

Dear Mr. Mullin:

I am writing on behalf of Community Environmental Advocates Foundation
("CEA Foundation") regarding violations of the Clean Water Act[1] ("CWA" or "Act") at
the Idaho-Maryland Mine complex in Nevada County, California.[2] The purpose of this

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*

[2] For the purposes of this Notice Letter, and unless stated otherwise, the term "Idaho-
Maryland Mine complex" refers collectively to the approximately 2,585-acre subsurface
estate and approximately 175.4 acres of surface properties owned by Rise Gold Corp. in
Nevada County, California, and which are described more particularly in K. Elliott & D.
Kindermann, *Nevada County Board of Supervisors Board Agenda Memorandum* at 3

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 2

letter ("Notice Letter") is to put Rise Gold Corp. and its wholly owned subsidiary, Rise Grass Valley, Inc. (collectively, "Rise"), on notice that, at the expiration of sixty (60) days from the date this Notice Letter is served, CEA Foundation intends to file a "citizen suit" against Rise in U.S. federal district court.

The civil action will allege significant and ongoing conduct at the Idaho-Maryland Mine complex resulting in violations of the Act, including but not limited to the continuous discharge of water polluted with arsenic, various heavy metals, and other chemicals directly from the underground workings of the Idaho-Maryland Mine complex into Wolf Creek, via several drains.

## BACKGROUND

This Notice Letter concerns the ongoing discharge of polluted waters from the underground workings of the former Idaho-Maryland Mine complex in Nevada County, California. This mine complex—which consists of several separate historical mines—produced approximately 2.4 million ounces of gold between 1866 and 1956.[3] During the mine complex's operations, mercury and cyanide were used to recover gold from the mined ore.[4] The underground workings of the complex ultimately grew to include approximately 73 miles of tunnels, several raises, 4 inclined shafts, and 2 vertical shafts.[5] When the Idaho-Maryland Mine ceased operations in 1956, these extensive underground

---

(Nov. 28, 2023), available at
https://www.nevadacountyca.gov/DocumentCenter/View/51714/2-Staff-Report.

[3] *See* K. Elliott & D. Kindermann, *supra* note 2, at 5; EMKO Environmental, Inc., *Groundwater Hydrology and Water Quality Analysis Report for the Idaho-Maryland Mine Project – Nevada County, California* at 3 (Feb. 2021), available at
https://www.nevadacountyca.gov/DocumentCenter/View/41645/Appendix-K2_Groundwater-Hydrology-and-Water-Quality-Analysis.

[4] Weston Solutions, Inc., *Site Inspection Report – Idaho Maryland Mine – Grass Valley, Nevada County, CA* at 1, 5 (Sept. 2019), available at
https://www.envirostor.dtsc.ca.gov/getfile?filename=/public%2Fdeliverable_documents%2F6354388177%2FIMM%20SI%20text%20through%20App%20D%209-24-19.pdf.
The Weston Solutions report was prepared at the request of Region 9 of the U.S. Environmental Protection Agency ("EPA").

[5] Elliott & Kindermann, *supra* note 2, at 3; EMKO, *supra* note 3, at 3, 36-37.

SHUTE, MIHALY
& WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 3

workings were allowed to flood with water.[6] The workings have remained flooded in the decades following the closure.[7]

Rise currently owns an approximately 2,585-acre subsurface estate, which encompasses the historical Idaho-Maryland Mine complex and its underground workings.[8] Rise also owns two surface properties, which generally overlie the subsurface estate: the approximately 56.41-acre Centennial Industrial Site and the approximately 119-acre Brunswick Site.[9] The Centennial Industrial Site is immediately adjacent to Wolf Creek, a perennial tributary of the Bear River.[10] Portions of Wolf Creek adjacent to and downstream of the Centennial Industrial Site host wetland habitats and are used for fishing.[11]

There are approximately 1,183 acre-feet of water within the underground workings in Rise's subsurface estate.[12] Several drains continuously convey this water from the underground workings to surface waterbodies.[13] These drains have been present for at least thirty years, and likely much longer.[14] In particular, three drains in the immediate vicinity of the Centennial Industrial Site near Idaho Maryland Road discharge between dozens and hundreds of gallons of water per minute from the underground workings into Wolf Creek.[15] Rise's retained hydrological consultants have referred to

---

[6] Elliott & Kindermann, *supra* note 2, at 5; EMKO, *supra* note 3, at 3.

[7] EMKO, *supra* note 3, at 28.

[8] Elliott & Kindermann, *supra* note 2, at 3; EMKO, *supra* note 3, at 1.

[9] Elliott & Kindermann, *supra* note 2, at 3.

[10] EMKO, *supra* note 3, at 5, 13-15; Weston, *supra* note 4, at 1.

[11] Weston, *supra* note 4, at 1.

[12] EMKO, *supra* note 3, at 30.

[13] *Id.* at 28-29, 32-33, 59; *see also* Weston, *supra* note 4, at 18 (describing the East Eureka Outflow as a "hazardous substance source," as "water draining from the mine workings through the East Eureka Shaft . . . flow[s] directly into Wolf Creek" and that this water contains arsenic and lead "at concentrations significantly above background").

[14] EMKO, *supra* note 3, at 32 (citing Condor, 1994).

[15] *Id.* at 33 (describing the ED-1 – Eureka Drain, IMD-1 – East Eureka Shaft Drain, IMD-2 – East Eureka Shaft, and D-1 culvert); *see also id.* at 66 (estimating total flow from the drains at approximately 60 to 125 gallons per minute). The EMKO report indicates that there is uncertainty about whether the water discharged from a fourth drain, the D-1 culvert, originates in the underground workings. *Id.* at 33, 39, 55.

SHUTE, MIHALY
& WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 4

these drains as the "Eureka Drain," the "East Eureka Shaft Drain," the "East Eureka Shaft."[16]

The water conveyed from these drains into Wolf Creek contains high concentrations of several pollutants, including arsenic, assorted heavy metals, and other chemicals.[17] Sampling conducted in early 2018 indicates that at all three of the drains that indisputably discharge water from the underground workings:

- Arsenic concentrations are approximately 4 to 6 times higher than the relevant regulatory standards allow;[18]

- Iron concentrations are approximately 5 to 16 times higher than regulatory standards;[19]

- Manganese concentrations are approximately 4 to 6 times higher than regulatory standards;[20] and

- Ammonia concentrations are approximately 2 to 8 times higher than regulatory standards.[21]

Sampling of the water discharged from the drains in 1991 and 2006 was "consistent with the findings" collected in 2018, and thus "there does not appear to" have been "any significant change in the water quality in the shaft, drains, or creeks over the last two to three decades."[22] Additional sampling conducted on behalf of the U.S. EPA in 2019

---

[16] *Id.* at 33.

[17] *See id.* at 42-43. The relevant regulatory standards are the NPDES effluent limits. *Id.* at 47.

[18] *Id.* at 43 (showing arsenic concentrations between 37 and 41 micrograms/liter; NPDES limit is 10 micrograms/liter).

[19] *Id.* at 43, 46-47 (concentrations between 1,600 and 4,800 micrograms/liter; NPDES limit is 300 micrograms/liter).

[20] *Id.* at 43, 47 (concentrations between 200 and 300 micrograms/liter; NPDES limit is 50 micrograms/liter).

[21] *Id.* at 42 (concentrations between 50 and 240 micrograms/liter; NPDES limit is 25 micrograms/liter); *see also id.* (showing total suspended solid concentrations also exceeded the relevant regulatory standards at ED-1 and IMD-2); *id.* at 43 (showing zinc concentrations exceeded relevant regulatory standard at ED-1).

[22] *Id.* at 47.



Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 5

indicated that the drains were releasing both arsenic and other heavy metals into Wolf Creek.[23] Notably, some arsenic concentrations recorded in 2019 were significantly higher than those recorded in 2018 and were approximately 10 times above the relevant NPDES effluent limit.[24]

       The drains' discharge of polluted water into Wolf Creek appears to have a significant adverse impact on the Creek's water quality, as concentrations of arsenic, iron, and manganese are much higher downstream of the drain discharges than they are upstream.[25] Indeed, the iron and manganese concentrations in Wolf Creek meet the relevant NPDES effluent limits in the upstream samples but exceed those limits in the downstream samples.[26] Moreover, the 2019 sampling indicated that arsenic concentrations in Wolf Creek were also highest immediately downstream of the drains.[27]

       Rise has proposed to resume underground gold mining operations at the Idaho-Maryland Mine complex.[28] Before reinitiating mining, Rise would need to conduct an initial dewatering of the underground workings.[29] Water removed from the underground workings would be treated and discharged to South Fork Wolf Creek.[30] Rise has acknowledged that it would need to attain coverage under an NPDES permit before initiating this discharge.[31] Rise's consultant also acknowledged that after Rise ceased mining operations and the underground workings were allowed to reflood, Rise would

---

[23] *See* Weston, *supra* note 4, at 2, 11 (describing elevated concentrations of chromium, cobalt, copper, lead, nickel, and zinc in East Eureka Outflow samples).

[24] *See id.* at 11 (recording arsenic concentrations of 102 micrograms/liter within one drain and 41.8 micrograms/liter at the point where the drain discharges to Wolf Creek).

[25] *See* EMKO, *supra* note 3, at 46, 51-52 (showing arsenic concentrations of 4.0 micrograms/liter downstream of the drains and 1.3 micrograms/liter upstream of the drains; iron concentrations of 310 micrograms/liter downstream of the drains and 240 micrograms/liter downstream of the drains; manganese concentrations of 35 micrograms/liter downstream of the drains and 15 micrograms/liter upstream of the drains); *see also id.* (attributing the discrepancy in heavy metal concentrations in the upstream and downstream Wolf Creek samples to the drain discharges).

[26] *Id.* at 46, 53.

[27] Weston, *supra* note 4, at 12-13.

[28] EMKO, *supra* note 3, at 1.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 4-5, 109-11.

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 6

likely require an NPDES permit to cover the water that will once again flow from the drains to Wolf Creek.[32] However, Rise does not hold an NPDES permit that covers the ongoing point source discharges of polluted water from the underground workings within its subsurface estate.[33]

## APPLICABILITY OF THE CWA

The CWA prohibits the "discharge of any pollutant by any person" unless done in compliance with some provision of the Act. 33 U.S.C. § 1341(a). Section 402 of the CWA requires a permit for the discharge of pollutants into navigable waters. *Id.* § 1342(a)(1). As set forth below, Rise is in violation of the CWA because the drains near the Centennial Industrial Site are continuously discharging water laden with pollutants into Wolf Creek from the flooded underground mine workings within Rise's subsurface estate, and Rise has no NPDES permit covering these discharges.

In fact, Rise and its expert consultants have already effectively conceded this violation. In recognizing that Rise would need an NPDES permit to cover both the active dewatering of the mine[34] and any discharge from the drains that resumes after its mining operations end,[35] Rise has tacitly acknowledged: (1) the arsenic, heavy metals, and chemicals within the water in the mine complex's underground workings are "pollutants"; (2) Wolf Creek, South Fork Wolf Creek, and other similar tributaries of the Bear River are waters of the United States; (3) the flow of the pollutant-laden mine water into these surface water bodies constitutes "discharge"; and (4) Rise holds no existing NPDES permit that authorizes this discharge.

---

[32] *See* EMKO, *supra* note 3, at 117 (recognizing that "[a]fter mining is completed, water from the underground mine workings would eventually begin to seep from the existing drains or from rockbed fractures if the drains are sealed," and that "before the mine is allowed to flood, an application could be made with the Regional Water Board for an individual permit to cover the mine drainage); *id.* (acknowledging that under this permit, Rise could dilute the receiving waterbody or "treat[] . . . the water from the drains, prior to discharge to Wolf Creek, similar to the drainage from the inactive Newmont Northstar Mine").

[33] *See* Weston, *supra* note 4, at 7 (indicating an NPDES permit issued by the Central Valley Regional Water Quality Control Board in 1995 for an earlier mine dewatering proposal was later cancelled).

[34] EMKO, *supra* note 3, at 4-5, 109-11.

[35] *Id.* at 117.

SHUTE, MIHALY
&
WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 7

The only apparent difference between these future discharges—for which Rise acknowledges it would need an NPDES permit—and the current discharges from the Idaho-Maryland Mine complex—for which Rise has none—is the fact that Rise itself has not yet begun mining on the site. But this fact is immaterial for CWA liability. It is well established that the Act is a strict liability statute. Put simply, "if you own the leaky 'faucet,' you are responsible for its 'drips.'" *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1145 (10th Cir. 2005), *cert. denied*, *El Paso Props., Inc. v. Sierra Club*, 547 U.S. 1065 (2006). Thus, in *El Paso Gold Mines*, it did not matter that the current owner of an inactive gold mine had not itself "acted in some way to cause the discharge" of polluted water from the mine's underground workings. *Id.* It was enough that the company owned the defunct mine shafts from which the pollutants flowed. *See id.* at 1143-45; *see also Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308-09 (9th Cir. 1993) (concluding utility district was liable for ongoing, unpermitted flow of polluted water from "abandoned mine site"). Because Rise now owns the Idaho-Maryland Mine complex, it is liable for any ongoing, unpermitted discharges of pollutants from it.

Moreover, the Central Valley Regional Water Quality Control Board—the state entity responsible for administering the CWA in Nevada County—has concluded that virtually identical discharges require an NPDES permit. In the 1970s, the California Department of Parks and Recreation purchased the defunct Empire Mine in Nevada County and began operating the site as Empire Mine State Historic Park, a recreational facility with no active mining operations.[36] The Empire Mine site is immediately south of the Rise-owned Brunswick Site and roughly one mile south of the Idaho-Maryland Mine complex drains. In 2002, the Regional Water Board determined that the historical "Magenta Drain" on the Empire Mine site was passively discharging water from the flooded underground workings of the Empire Mine to an unnamed tributary of the South Fork of Wolf Creek.[37] Like the discharges from Rise's drains, the water flowing from the

---

[36] *See* Cal. Reg'l Water Quality Control Bd., Central Valley Region ("Regional Water Board"), *Order No. R5-2006-0058 / NPDES No. CA0085171: Waste Discharge Requirements for State of California Department of Parks and Recreation Empire Mine State Historic Park Nevada County* at F-4 (June 23, 2006), available at https://ciwqs.waterboards.ca.gov/ciwqs/readOnly/CiwqsReportServlet?reportID=5734716&inCommand=displaysubpage&subPage=rmAttachmentPopup&regMeasID=313660.
[37] *Id.* at F-5 to F-6.

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 8


Magenta Drain contained elevated levels of arsenic, iron, and manganese, among other chemicals.[38]

The Regional Water Board determined that the flows from the Magenta Drain constituted an unpermitted discharge of pollutants from a point source to a water of the United States.[39] It therefore required the Department of Parks and Recreation to attain an NPDES permit.[40] The Department then developed and implemented a passive water treatment system to ensure that the water discharged from the Magenta Drain satisfied the effluent limits in the NPDES permit.[41] If the Department is liable under the CWA for the Magenta Drain discharges, Rise must be liable for the very similar discharges of pollutants from the Idaho-Maryland Mine complex drains.

## DISCHARGE OF A POLLUTANT

Under the CWA, a "discharge of a pollutant" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). An addition occurs when a point source introduces a pollutant into navigable water from the "outside world." *Nat'l Wildlife Fed. v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982). In this context, "outside world" means any place outside the particular water body into which pollutants are introduced. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273

---

[38] *Id.* at F-5, F-22 to F-32. The concentrations of arsenic recorded at the immediate outlet of the Magenta Drain (54.0 to 77.2 micrograms per liter) were similar to the arsenic concentrations that have been recorded at the outlet points of the three Idaho-Maryland Mine complex drains (37 to 59 micrograms per liter). *See id.* at F-33, F-34; EMKO, *supra* note 3, at 43; Weston, *supra* note 4, at 11.

[39] Regional Water Board, *supra* note 36, at 3, F-5 to F-6.

[40] *Id.*

[41] *See* Regional Water Board, *Order R5-2012-0050 / NPDES No. CA0085171: Waste Discharge Requirements for the State of California Department of Parks and Recreation Empire Mine State Historic Park Nevada County* (June 8, 2012), available at https://ciwqs.waterboards.ca.gov/ciwqs/readOnly/CiwqsReportServlet?reportID=573471 6&inCommand=displaysubpage&subPage=rmAttachmentPopup&regMeasID=385621 (describing treatment strategies implemented following issuance of initial NPDES permit in 2006). The Regional Water Board later authorized the Department to continue discharging under a general NPDES permit for "limited threat" discharges. *See* Regional Water Board, *Order R5-2017-0083* at 4-5 (June 9, 2017), available at https://www.waterboards.ca.gov/centralvalley/board_decisions/adopted_orders/rescission s/r5-2017-0083_rec.pdf.

SHUTE, MIHALY
& WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 9

F.3d 481, 491-92 (2d Cir. 2001). Thus, collecting acid drainage seeping from abandoned mine workings and then channeling that drainage into a surface water body constitutes the "discharge of a pollutant." *Comm. to Save Mokelumne River*, 13 F.3d at 306-09. A "pollutant," in turn, is broadly defined as including "dredged spoil, solid waste," "chemical wastes, biological materials," "rock, sand, . . . and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

It is beyond dispute that the significant quantities of arsenic, iron, manganese, and other heavy metals and chemicals discharged from the Idaho-Maryland Mine complex drains are "pollutants" under the CWA. *See El Paso Gold Mines*, 421 F.3d at 1138, 1141 (indicating "zinc and manganese" that have leached into water within the underground workings of an abandoned mine are "pollutants"); *Comm. to Save Mokelumne River*, 13 F.3d at 306 (indicating "acid mine drainage" with "high concentrations of aluminum, cadmium, copper, zinc, iron, and sulfuric acid" resulting from water seeping into abandoned mine workings is a "pollutant"); *Beartooth All. v. Crown Butte Mines*, 904 F.Supp. 1168, 1172-73 (D. Mont. 1995) (tracing the clear relationship between mining activities and elevated concentrations of chemicals like arsenic, iron, lead, and manganese, and emphasizing that whether these chemicals occurred historically or naturally in some amounts is irrelevant to whether they are "pollutants" under the CWA).

It is also clear that the drains are "discharg[ing]" pollutants by causing the direct "addition" of pollutant-laden water from the Idaho-Maryland Mine complex's flooded workings directly into Wolf Creek. *See Comm. to Save Mokelumne River*, 13 F.3d at 306-09; *Beartooth All.*, 904 F.Supp. at 1172. The science supporting this is unequivocal. Rise's own professional consultant and a separate hydrology expert retained by the EPA each recorded significantly elevated concentrations of arsenic, iron, manganese, and other chemicals at the drains near the Centennial Industrial Site.[42] Each of those sets of experts concluded that these drains were discharging between dozens and hundreds of gallons per minute of this pollutant-laden water from the flooded underground workings in Rise's subsurface estate into Wolf Creek.[43] And each concluded that the concentrations of certain pollutants in Wolf Creek are greater downstream of the drains *because of* the polluted water being discharged from those drains.[44]

---

[42] *See* EMKO, *supra* note 3, at 39-47; Weston, *supra* note 4, at 11, 18.

[43] EMKO, *supra* note 3, at 32-33, 59; Weston, *supra* note 4, at 1, 4, 18.

[44] *See* EMKO, *supra* note 3, at 51 ("The increasing concentration [of iron and manganese] from upstream to downstream is indicative of the increasing proportion of groundwater discharge and flow from the drains as Wolf Creek passes through the project

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 10

## FROM A POINT SOURCE

The CWA defines a "point source" as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). This specifically includes any "pipe, ditch, channel, tunnel, conduit," or "discrete fissure." *Id.* It is indisputable that each drain that discharges water from the underground workings of the Idaho-Maryland Mine complex into Wolf Creek is a "point source" under the Act.[45] *See El Paso Gold Mines*, 421 F.3d at 1140 n.4, 1141 n.6 (explaining underground mine shafts and tunnels were "undoubtedly" point sources); *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984) (concluding that when mining operations lead to the discharge of water "from a discernible conveyance," they are subject to regulation as point sources); *Beartooth All.*, 904 F.Supp. at 1173-74 (holding various mine adits and pits were point sources and emphasizing both Congress and the EPA intend for the term "point source" to be "interpreted broadly"). Just like the Magenta Drain on the Eureka Mine site and the tunnels and shafts in *El Paso Gold Mines*, the drains associated with the Idaho-Maryland Mine complex and any underground workings conveying water to those drains are discrete conveyances from which pollutants are being discharged.

---

site area."); Weston, *supra* note 4, at 12-13 (reporting highest arsenic concentrations in Wolf Creek immediately downstream of the drains); *id.* at 18 (attributing elevated arsenic and lead levels in Wolf Creek in part to drain outflows).

Although the data and expert reports conclusively show that the drains *are* increasing the concentrations of pollutants in Wolf Creek, Rise would be liable for CWA violations even if this were not so. Under the Act, it is enough to show that there is a "discharge of a pollutant from a point source without a permit"; there is no need to make the additional showing that discharge from the point source is "produc[ing] a net increase in" pollutants in the receiving surface water body. *Comm. to Save Mokelumne River*, 13 F.3d at 309; *see also Beartooth All.*, 904 F.Supp. at 1173 ("The court in *Mokelumne River* explained that the CWA does not impose liability only where a net increase in the level of pollution from a point source discharge is present. . . . Rather, the CWA categorically prohibits any discharge of a pollutant from a point source without a permit.").

[45] For the same reasons, any underground mine workings within Rise's subsurface estate that channel the water to the outlet drains are also "point sources" under the Act. *See El Paso Gold Mines*, 421 F.3d at 1141 n.6 (explaining both mine shaft and outlet tunnel to which it connects are point sources). Rise is liable for these discharges irrespective of the identity of the parties that own the surface estates where the drain outlets are located.

SHUTE, MIHALY
& WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 11

### INTO NAVIGABLE WATERS

Navigable waters are "waters of the United States." 33 U.S.C. § 1362 (7). Wolf Creek is a perennial tributary of the Bear River, which itself is tributary to the Feather River. The CWA is concerned with the pollution of tributaries as well as with the pollution of navigable streams, as it "it is incontestable that substantial pollution of one not only may but very probably will affect the other." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 534 (9th Cir. 2001). Thus, even intermittently flowing tributaries of navigable streams are themselves waters of the United States. *Id.*; *see also United States v. Moses*, 496 F.3d 984, 989-91 (9th Cir. 2007) (reaffirming the holding in *Headwaters* following the U.S. Supreme Court's ruling in *Rapanos v. United States*, 547 U.S. 715 (2006)); 40 C.F.R. § 120.2 (defining "Waters of the United States" to include "relatively permanent, standing, or continuously flowing" "[t]ributaries of" all waters that are "[c]urrently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce"). Because the Bear River is navigable and Wolf Creek is its perennial tributary, Wolf Creek is a water of the United States irrespective of whether Wolf Creek itself is navigable. Indeed, both the Regional Water Board and Rise itself have already acknowledged this.[46]

### RELIEF SOUGHT FOR VIOLATION OF CLEAN WATER ACT

The contaminated water flowing into Wolf Creek from the Idaho-Maryland Mine complex's drains constitutes a discharge of pollutants into a navigable water from a point source. Therefore, Rise requires an NPDES permit for this ongoing discharge under the CWA. Because Rise does not have an NPDES permit covering its discharge of pollutants into Wolf Creek, it is in violation of section 402 of the CWA.

Pursuant to section 309(d) of the Act, 33 U.S.C. §1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects the violator to penalties of up to $66,712 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023.[47] In determining the amount of civil penalty to award, a court shall consider (1) the

---

[46] *See* Regional Water Board, *supra* note 36, at F-5 to F-6 (concluding even smaller and more intermittent tributaries of Wolf Creek are waters of the United States); EMKO, *supra* note 3, at 4-5, 109-11, 117 (similar).

[47] For illustrative purposes, were Rise assessed the maximum statutory penalty for each of the three drains for each day between August 5, 2019, and August 5, 2024, the total monetary penalty would be $365,648,472 (3 drains/violations * 1,827 days * $66,712).

SHUTE, MIHALY
& WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 12

seriousness of the violations; (2) any economic benefit gained from the violations; (3) the history of such violations; (4) any good-faith efforts to comply with applicable requirements; (5) the economic impact of the penalty on the violator; and (6) any other matters that justice may require. 33 U.S.C. § 1319(d).

In addition to civil penalties, CEA Foundation will seek injunctive relief preventing further violations of the Act pursuant to sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to section 505(d) of the Act, 33 U.S.C. § 1365(d), CEA Foundation will seek to recover its costs, including attorneys' and expert fees, associated with this enforcement action.

## NOTICE OF INTENT TO SUE

If Rise does not act within 60 days to correct this violation of the CWA, by applying to the Central Valley Regional Water Quality Control Board for an NPDES permit, CEA Foundation will seek relief in federal district court under the CWA's citizen suit provision, 33 U.S.C. § 1365(b)(1)(A).

## NOTICING PARTY AND ITS LEGAL COUNSEL

The party giving this notice is:

Community Environmental Advocates Foundation
P.O. Box 972
Cedar Ridge, CA 95924-0972
info@cea-nc.org

Legal counsel to the party giving this notice is:

Ryan K. Gallagher
rgallagher@smwlaw.com
Ellison Folk
folk@smwlaw.com
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, CA 94102
(415) 552-7272

SHUTE, MIHALY
&
WEINBERGER LLP

Rise Grass Valley, Inc.
Rise Gold Corp.
September 5, 2024
Page 13


All correspondence regarding this Notice Letter should be directed to CEA Foundation's legal counsel.

Very truly yours,

SHUTE, MIHALY & WEINBERGER LLP

Ryan K. Gallagher, Attorney

**Attachments**

A.     Service List

1810732.5

SHUTE, MIHALY
& WEINBERGER LLP

## ATTACHMENT A

### SERVICE LIST

#### *Via Certified Mail / Return Receipt Requested*

Joseph Mullin
President, Rise Grass Valley, Inc.
President and CEO, Rise Gold Corp.
345 Crown Point Circle, Suite 600
Grass Valley, CA 95945

Paracorp Incorporated
(Registered Agent for Rise Grass Valley, Inc.)
2804 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Nevada Business Center, LLC
(Registered Agent for Rise Gold Corp.)
701 South Carson Street, Suite 200
Carson City, NV 89701

#### *Via U.S. Mail*

Michael Regan, Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Eric Oppenheimer, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Patrick Pulupa, Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670-6114

1820018.1