UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

COMMUNITY ENVIRONMENTAL
ADVOCATES FOUNDATION,

           Plaintiff,

    v.

RISE GRASS VALLEY, INC.,

           Defendant.

No. 2:24-cv-03643-WBS-CSK

MEMORANDUM AND ORDER

----oo0oo----

       This case concerns pollutants allegedly emitted from a subsurface gold mine owned by defendant.  It involves just one claim:  that defendant discharged those pollutants into a local creek without a permit in violation of the Clean Water Act (the "CWA"), 33 U.S.C. §§ 1311(a), 1365(a), 1365(f).  (See Docket No. 1 (Compl.) at 17-18.)

I.   Factual Background

       The Idaho-Maryland Mine (the "Mine") is a "large, subsurface gold mine" in Nevada County, California, near the City

1

of Grass Valley, California.  (Docket No. 33-1 at 2.)  The Mine "consists of various underground workings, including approximately 73 miles of tunnels," various shafts, and other structures called "raises, winzes, slopes, and lateral drifts." (Id.)

The Mine's existing shafts include the New Brunswick Shaft, the Eureka Shaft, and the East Eureka Shaft.  (Id. at 3.) The Eureka and East Eureka Shafts are connected to the rest of the Mine's "underground workings," including the New Brunswick Shaft.  (Id. at 3-4.)

In 2017, defendant Rise Grass Valley, Inc. ("Rise") purchased the Mine complex.  (Id. at 4.)  Rise's "ownership interest in the Mine" includes "all . . . subsurface workings of the Mine that are more than 200 feet below the ground surface." (Id. at 5.)  Rise also owns two surface-level industrial sites that are "associated" with the Mine and "overlie" the Mine's "mineral estate":  the Centennial Industrial Site and the Brunswick Industrial Site.  (Id. at 5-6.)  The Brunswick Industrial Site "encompasses the surface opening of the New Brunswick Shaft."  (Id. at 6.)

The Mine stopped operating in the 1950s, and its "miles of underground workings were allowed to flood with water."  (Id.) Now, the Mine holds approximately 385 million gallons of water, over 90 percent of which lie "more than 580 feet below the ground surface."  (Id.)  Water samples collected from the New Brunswick Shaft at depths more than 200 feet below ground surface contain iron concentrations at "approximately five times" greater than

2

federal limits.  (Id. at 7.)  Similarly, manganese concentrations from that same shaft sampled on February 15, 2018, were also "approximately five times" greater than federal limits.  (Id. at 7-8.)

The water within the Mine is not static; rather, it seeps into the shafts and throughout the Mine's underground workings.  (Id. at 8.)  Generally, water within the Mine's underground workings "flows downward through the Mine's horizontal shafts until it reaches a horizontal tunnel or drift"; it can then flow "northwest, toward the Eureka Shaft and East Eureka Shaft."  (Id. at 9.)

The parties dispute whether the Eureka Shaft is connected to the Eureka Drain.  (Id. at 10.)  The parties do not dispute, however, that water flowing from the Eureka Drain "discharges to Wolf Creek."  (Id. at 12.)  Likewise, the parties dispute whether the East Eureka Shaft is connected to the East Eureka Shaft Drain (id. at 12-13), but do not dispute that water flowing from the East Eureka Shaft Drain runs to Wolf Creek (id. at 13).  Nevertheless, one set of water samples revealed that arsenic levels in Wolf Creek downstream of the various drains were more than double the arsenic levels upstream of those drains, and another set of water samples revealed that iron and manganese levels in Wolf Creek downstream of those drains were "markedly higher" than the concentrations upstream of those drains.  (Id. at 19.)

Rise sought to re-open the Mine after purchasing it. (Id. at 21.)  To do so, it applied for "several discretionary

3

land use approvals from Nevada County in 2020," pursuant to which it was required to "analyze the environmental impacts of the Mine reopening project under the California Environmental Quality Act." (Id.)  As part of this process, Rise commissioned several technical reports to support its permit applications and inform Nevada County's environmental review.  (Id.)

One such report was prepared by EMKO Environmental, Inc., in February 2021 (the "EMKO Report").  This report hypothesized that the water discharging from the Eureka Drain, the East Eureka Shaft Drain, and the East Eureka Shaft "originated in the Mine's flooded underground workings, including the New Brunswick Shaft."  (Id. at 23.)

Nevada County commissioned an independent peer review of the EMKO Report as part of its environmental review.  (Id. at 27.)  This report, which was prepared by the West Yost engineering firm, (the "West Yost Report"), concluded that "the EMKO Report adequately describes and interprets the relevant discharge water quality data."  (Id.)

Rise also commissioned a technical study of "the existing Mine features located near the ground surface."  (Id. at 28.)  This report was finalized by the engineering firm NV5 in September 2020 (the "NV5 Report").  The NV5 Report states that the "similarities between the Eureka Drain and Eureka Shaft suggest[] that the two are hydraulically connected."  (Id. at 29.)

Yet one more technical report features here.  This report was commissioned by Rise and prepared by Geocon

4

Consultants, Inc., on November 1, 2024 (the "Geocon Report"). The Geocon Report referenced "waste discharge to surface water from the . . . Mine" and discharges from the "three drains . . . that discharge to Wolf Creek." (Id. at 39.) This report also represented that the Eureka Drain, the East Eureka Shaft Drain, and the East Eureka Shaft discharge to Wolf Creek and found that water samples collected from these drains in 2018 and 2019 included "elevated concentrations of arsenic, iron, and manganese," in excess of federal limits. (Id. at 40-41.)

II.  Parties and Procedural Background

Plaintiff Community Environmental Advocates Foundation ("CEA") is a nonprofit organization based in Nevada County, California. (Id. at 32.) It was formed in 2017 and has since "worked to carry out research, education, and advocacy to promote public policy and actions resulting in responsible land use in the County and the broader Sierra Nevada region, with the goals of preserving the area's natural, rural, and cultural resources." (Id. at 33.) CEA and its members have "engaged in research and advocacy regarding Rise's proposal to re-open the Mine," (id.), including by serving Rise with a "Notice of Ongoing Violations and Intent to File a Citizen Suit under the Clean Water Act" (the "Notice") on September 5, 2024 (id. at 36-37).

The Notice explained that Rise was violating the CWA by "allowing polluted water from its Mine workings to discharge to Wolf Creek" without a valid permit. (Id. at 37.) It also advised that CEA intended to file suit under the CWA if Rise did not remedy its alleged violations within 60 days. (Id.)

5

On November 1, 2024, Rise submitted a discharge permit application to the relevant authority.  (Id. at 37-38.)  In its application, Rise stated that it was "seeking permit coverage for existing discharge to surface water, and characterized the discharge as related to [m]ining."  (Id. at 38 (citation modified).)  The precise status of Rise's permit application is unknown, but it is undisputed that Rise has yet to receive a permit.

The instant action followed shortly thereafter.  The matter now before the court is CEA's motion for partial summary judgment as to Rise's liability under the CWA.  (See Docket No. 22 at 36.)

III. Analysis

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

a.   Standing

"At the summary judgment stage, [a] plaintiff[] must identify 'specific facts' establishing standing."  California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior, 767 F.3d 781, 789 (9th Cir. 2014) (quoting Clapper

6

v. Amnesty Int'l USA, 568 U.S. 398, 412 (2013)).  The Ninth Circuit has found that the Clean Water Act's citizen-suit provision "extends standing to the outer boundaries set by the 'case or controversy' requirement of Article III of the Constitution."  Ecological Rts. Found. v. Pac. Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000).  Accordingly, the court determines whether plaintiff CEA has standing under Article III of the Constitution.  See id.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 553 (1996) (citation omitted).

In turn, for one of CEA's members to have "standing to sue in [his] own right," id., he must "demonstrate three elements":  (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent"; (2) a causal connection, meaning the injury must be "fairly traceable" to the "conduct complained of," and (3) redressability, meaning that a "favorable decision" would be "likely to redress the injury-in-fact," Barnum Timber Co. v. U.S. E.P.A., 633 F.3d 894, 897 (9th Cir. 2011) (citation modified).  "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that []he has an aesthetic or recreational

interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." Ecological Rts. Found., 230 F.3d at 1147 (collecting cases).

          i.    Standing of Member to Sue in His Own Right

CEA argues that its members -- including Denise Bellas, Jonathan Keehn, and Ralph Silberstein -- have standing to sue in their own right. (See Docket No. 35 at 7-10.) The court agrees.

Silberstein has established an injury-in-fact. As a "resident of the City of Grass Valley in Nevada County, California" for nearly thirty years, he has "recreated in and around the vicinity of Wolf Creek" for that duration. (Docket No. 26 (Silberstein Decl.) at 5.) He used to "fish, swim, and wade in the Creek" but has stopped doing so "because of pollution concerns." (Id.) In particular, he has ceased consuming the fish he used to catch in Wolf Creek "due to concerns about the potential adverse effects of the pollution from the Mine" to the water of that Creek and resulting risks to his health. (Id. at 5-6.) Defendant does not appear to dispute that Silberstein has established an injury-in-fact (see Docket No. 33 at 26-27), nor could it, because the Supreme Court has found environmental plaintiffs to have established an injury-in-fact under indistinguishable circumstances. See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 182-83 (2000) (finding injury-in-fact where individual wished to "fish, hike, and picnic along" body of water but "refrained from those activities" due to pollution); see also Ecological Rts. Found., 230 F. 3d at 1149-50 (describing Laidlaw).

8

Defendant argues that Silberstein's injury is not "fairly traceable" to its actions because Silberstein has failed to establish that the Mine is responsible for the pollution in Wolf Creek.  (Docket No. 33 at 27.)   This argument conflates the merits of plaintiff's CWA claim with whether plaintiff has standing.  See Ecological Rts. Found., 230 F. 3d at 1152.  The Ninth Circuit has explained that a plaintiff "need not prove to a scientific certainty" that the defendant "has, in fact, discharged pollutants in violation of its permits in order to obtain standing" to assert a CWA claim.  Id. (emphasis in original); see also California Sportfishing Prot. All. v. All Star Auto Wrecking, Inc., 860 F. Supp. 2d 1144, 1152 (E.D. Cal. 2012) (Mendez, J.) (applying Ecological Rts. Found.).  Indeed, "[i]n the CWA context, causation does not require pinpointing the origins of particular molecules; instead, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  Californians for Alternatives to Toxics v. Schneider Dock & Intermodal Facility, Inc., 374 F. Supp. 3d 897, 909 (N.D. Cal. 2019) (quotations omitted).  Silberstein has done so here, most saliently by referencing within and attaching to his declaration a letter in which he documents the excess pollutants measured in Wolf Creek that the Mine allegedly emitted.  (See Silberstein Decl. at 9-11.)

Silberstein's injury would also be redressed if defendant were to rectify the pollutants their Mine allegedly emitted.  See Barnum Timber Co., 633 F.3d at 897.  Accordingly,

Silverstein has standing to sue in his own right.  See id.[1]

     ii.    Interests Germane to Organization's Purpose

    In bringing the instant action challenging pollution to local waters, CEA clearly seeks to protect interests "germane" to its "purpose," Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977), namely, "carry[ing] out research, education, and advocacy to promote public policy and actions resulting in responsible land use and environmental protection in Nevada County and the Sierra Nevada region, with the overall goal of preserving the area's natural, rural, and cultural resources," (Silberstein Decl. at 2).

     iii. Participation of Individual Members

    "The participation of individual members is not required when the claims proffered and relief requested do not demand individualized proof on the part of an association's members."  Gay-Straight All. Network v. Visalia Unified Sch. Dist., 262 F. Supp. 2d 1088, 1105 (E.D. Cal. 2001) (Wanger, J.). In its complaint, plaintiff requests declaratory and injunctive relief as well as the assessment of civil monetary penalties against defendant.  (Docket No. 1 at 18-19.)  None of the forms of relief CEA requests requires the participation of its

---

[1]    The court need not address whether the other CEA members have standing to sue in their own right for the purposes of determining whether CEA has associational standing.  See Ecological Rts. Found., 230 F.3d at 1150 n.10 ("If the sole affiant could have brought a citizen suit as an individual, then he has stated an injury in fact sufficient to confer standing on an organization that seeks to sue on his behalf.").

individual members.  See Oregon State Pub. Int. Rsch. Grp., Inc. v. Pac. Coast Seafoods Co., 361 F. Supp. 2d 1232, 1240 (D. Or. 2005) (finding, in CWA action, that "participation of the individual members" of organization was "not required" because "plaintiffs s[ought] an injunction and civil penalties, not individual damages").

Having determined that an individual member of CEA has standing to sue in his own right, that CEA seeks to protect interests germane to its purpose in bringing this lawsuit, and that CEA's individual members need not participate in this lawsuit to fashion relief, the court finds that CEA has associational standing to bring its CWA claim against defendant. See United Food & Com. Workers Union Loc. 751, 517 U.S. at 553.

b.   Clean Water Act Claim

To establish a violation of the CWA, "a plaintiff must prove that the defendant (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit." Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1142 (10th Cir. 2005), as corrected (Oct. 21, 2005); see also Nat'l Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 165 (D.C. Cir. 1982) (same).[2]  The CWA "defines the phrase 'discharge of a pollutant' to mean 'any addition of any pollutant to navigable waters from any point source.'"  S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1362(12)).

---

[2]   The parties agree that this is the relevant test for assessing CWA liability.  (See Docket No. 35 at 10.)

i.   Pollutant

A "pollutant" includes "chemical wastes, biological materials, radioactive materials, . . . rock . . . and industrial . . . waste discharged into water."  33 U.S.C. § 1362(6).  The alleged pollutants present in Wolf Creek that CEA identifies are arsenic, iron, and manganese.  (Docket No. 22 at 30-31.)  Rise does not dispute that these materials, which allegedly drained from its Mine, are "pollutants" within the meaning of the CWA.  (See generally Docket No. 33).  Nor could it.  See, e.g., Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist., 13 F.3d 305, 308-09 (9th Cir. 1993) (finding "surface runoff containing acid mine drainage" to be a pollutant under the CWA); Native Vill. of Kivalina IRA Council v. U.S. E.P.A., 687 F.3d 1216, 1218 (9th Cir. 2012) (zinc and lead mine's wastewater that contained metals subject to CWA regulation).

ii.   Discharge

The Ninth Circuit has stated that a defendant discharges a pollutant when it "add[s]" that pollutant to the relevant body.  Idaho Conservation League v. Poe, 86 F.4th 1243, 1246 (9th Cir. 2023); see also 13 U.S.C. § 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant . . .").

Defendant argues that CEA has failed to prove how it "added" the observed pollutants because the pollutants are (1) simply recirculated from water already in Wolf Creek or (2) occur naturally.  (See Docket No. 33 at 29-30.)  The court addresses each argument in turn.

12

Defendant's argument that the water discharging from the drain constitutes polluted water moving from one "part" of Wolf Creek to another (see Docket No. 33 at 29-31) is flawed because the observed pollutants undisputedly occur in significantly higher concentrations downstream of the surface drains than they occur upstream of the surface drains (see Docket No. 33-1 at 19). If defendant's explanation were accurate, the concentrations of the observed pollutants in Wolf Creek would be similar both immediately upstream and downstream of the surface drains. (See id.)

Furthermore, the EMKO Report sampled water discharged from a nearby drain (the "D-1 drain") that had no connection to the Mine's underground workings, and found that, unlike the water samples from the drains that were connected to the Mine's underground workings, water discharged from the D-1 drain did not contain any iron or manganese and contained a fraction of the amount of arsenic sampled from the Mine-connected drains. (Docket No. 35 at 23.) This empirical finding, which defendant does not dispute, bolsters the conclusion that the Mine, not the waters of Wolf Creek, is responsible for the observed pollutants. See Idaho Conservation League, 86 F.4th at 1248 (adding "waste material" produced in mining operation to water that was "not already suspended" in that water constituted "adding" pollutant within meaning of CWA).

Nor can the court credit defendant's argument that it is not "adding" the observed pollutants to Wolf Creek because arsenic, iron, and manganese occur naturally when water dissolves

13

a certain kind of rock present around the Mine.  (See Docket No. 33 at 30.)  CEA "does not dispute that the arsenic, iron, and manganese in the Mine drain discharges may well result from the water contacting surrounding rock as it flows through the Mine's underground workings."  (Docket No. 35 at 25.)  Rather, CEA argues that "the fact that the chemicals may enter the Mine drain water from contact with rock surrounding the Mine workings does not absolve Rise of liability for 'adding' these pollutants to Wolf Creek."  (Id.)

Based on binding precedent, the court agrees with CEA. The Ninth Circuit has expressly disavowed the "require[ment] of human transformation of all materials identified in the CWA's definition of 'pollutant'" for a material to constitute a pollutant within the meaning of that Act.  N. Plains Res. Council v. Fid. Expl. & Dev. Co., 325 F.3d 1155, 1163 (9th Cir. 2003). If human transformation were required, the Ninth Circuit explained, "water naturally laced with sulfur could be freely discharged into receiving water used for drinking water simply because the sulfur was not added to the discharged water," which would be a circumstance that "c[ould] [not] sensibly be credited."  Id.  Indeed, to "conclude otherwise" would "improperly undermine the integrity of the CWA's prohibitions" by focusing on "the alteration of the discharged water" instead of the "receiving body of water" (here, Wolf Creek) that the CWA is designed to protect.  Id. at 1162.

iii. Point Source

"A 'point source,' . . . is defined as 'any

14

discernible, confined and discrete conveyance,' such as a pipe, ditch, channel, or tunnel, 'from which pollutants are or may be discharged.'" S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. at 102-03 (quoting 33 U.S.C. § 1362(14)). "[M]ining activities" that "release pollutants from a discernible conveyance" constitute "point sources." Trs. for Alaska v. E.P.A., 749 F.2d 549, 558 (9th Cir. 1984). As such, the question here is whether the Eureka Shaft and East Eureka Shaft -- which belong to defendant and allegedly connect to the surface drains that, in turn, discharge polluted water into Wolf Creek -- constitute "point sources." (Docket No. 33 at 29.)

Defendant's position is that CEA has not demonstrated that the Eureka Shaft and the East Eureka Shaft are connected to the corresponding surface drains that discharge the polluted water into Wolf Creek, so these shafts accordingly cannot be the "point sources" of the pollutants observed in Wolf Creek. (See id.) Specifically, defendant argues that the technical reports described above that it commissioned, and plaintiff repeatedly cites to, do not establish that the Eureka and East Eureka shafts are connected to the surface drains because these reports "were not trying to prove whether the Eureka and East Eureka shafts were connected to" the surface drains and instead "provided" only "conceptual analyses . . . of the Mine's 73 miles of underground shafts and drifts." (Id. at 33.)

The court is unpersuaded by this argument. As plaintiff keenly observes, the Geocon Report describes the connections of the surface drains to the Eureka Shaft and the

15

East Eureka Shaft; a report commissioned by the Environmental Protection Agency (the "Weston Report") states that "[g]roundwater in the underground workings [of the Mine] currently drains through the East Eureka Shaft to Wolf Creek through the East Eureka Outflow located across Wolf Creek" and that "[a] hazardous substance source has been documented at the East Eureka Outflow, where water draining from the mine workings through the East Eureka Shaft was observed flowing directly into Wolf Creek"; the EMKO Report describes the connections between the surface drains to the Eureka Shaft and the East Eureka Shaft; and the NV5 Report concludes that one surface drain is "hydraulically connected" to the Eureka Shaft.  (Docket No. 35 at 15-16.)

Defendant counters with declarations by its experts stating that, in the purported absence of "physical evidence or reports," it is "[m]ore likely than not" that a surface drain "is not connected to the Eureka Shaft," (Docket No. 33-4 at 14), because the "locations of the Eureka Shaft and East Eureka Shaft are not known with certainty," (Docket No. 33-5 at 5).[3] Defendant's "speculation" regarding the possibility of alternative drain-shaft configurations is "insufficient to raise a genuine issue of material fact," in large part because it does not actually rebut the uniform conclusion reached in the various technical reports plaintiff invokes.  Brown v. Woodland Joint

[3]    The latter expert declaration expressly states that the "assumption of a connection between the [surface] drains and the [Eureka and East Eureka] shafts was a reasonable hypothesis." (Docket No. 33-5 at 6.)

16

Unified Sch. Dist., 27 F.3d 1373, 1382 (9th Cir. 1994); see also Guidroz-Brault v. Missouri Pac. R. Co., 254 F.3d 825, 829 (9th Cir. 2001) ("speculation" and "guesswork" cannot "survive summary judgment").  To create a genuine issue of material fact, defendant must "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (citation modified).  "[M]aking assertions" regarding potential, alternative drain-shaft configurations, devoid of factual support, is not enough.  See S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982) (collecting cases).

Defendant also argues that the discharge samples taken from the surface drains include chemicals that may not have originated from within the Mine (i.e. chemicals other than arsenic, iron, and manganese).  (See Docket No. 33 at 35-37.)  This is irrelevant to whether the drains discharged water containing pollutants that did originate from the Mine, which the EMKO, Geocon, and Weston Reports unanimously determined to be the case.  (See Docket No. 35 at 21.)  Moreover, the Weston and EMKO Reports specifically explain why and how other chemicals could have been present in the various discharge samples, as well as address additional, potential discrepancies.  (Id. at 21-22.)  Defendant does not rebut these explanations.  Once more, speculation regarding the possibility of an alternative source of pollutants does not suffice to create a genuine issue of material fact.  Brown, 27 F.3d at 1382.

iv.   Navigable Waters

17

"[N]avigable waters" are "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  These waters "clearly" include "nearby streams and rivers" that mines discharge into, Rybachek v. U.S. E.P.A., 904 F.2d 1276, 1285 (9th Cir. 1990), such as Wolf Creek.  Defendant does not dispute that Wolf Creek constitutes a navigable water.  (See Docket No. 33.)

    v.   Without a Permit

CEA argues, and Rise does not dispute, that Rise does not have a permit authorizing the ongoing discharges from the Mine.  (See Docket Nos. 22 at 32-33 (CEA's motion); 33 at 41-42 (Rise's opposition); 35 at 11 (CEA's reply).)  Rise instead emphasizes that it has applied for such a permit and urges the court to not mistake its "good-faith efforts" at "avoid[ing] costly litigation" in applying for such a permit as "satisfying CEA's burden of proof on summary judgment."  (Docket No. 33 at 43.)

Be that as it may, the legally relevant question is not whether Rise has demonstrated good faith or applied for a permit. See El Paso Gold Mines, Inc., 421 F.3d at 1142.  The legally relevant question is whether Rise has obtained a permit, see id., and, as discussed above, there is no dispute that Rise has not.

IV.  Conclusion

CEA has demonstrated that Rise has "(1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit," and therefore that Rise has violated the CWA. Id.

18

IT IS THEREFORE ORDERED that plaintiff's motion for partial summary judgment as to defendant's liability under the Clean Water Act (Docket No. 22) be, and the same hereby is, GRANTED.

Dated:  May 18, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE